# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER LEACH, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> NANCY A. BERRYHILL, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | Case No. 17 C 3409 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Christopher Leach applied for supplemental social security income (SSI) benefits, claiming that he suffers from physical and mental impairments that prevent him from working. He now seeks judicial review of the denial of his application by the Social Security Administration (SSA). The parties have filed cross-motions for summary judgment. For the reasons stated below, the Court grants Leach's motion, denies the government's motion, and remands the case for further consideration.

## Background

Leach applied for SSI on March 6, 2013, claiming a disability onset date of June 28, 2011. He stated that he suffered from degenerative disc disease, obesity, affective disorder, anxiety disorder, sleep apnea, hypothyroidism, and hand tremors.

The SSA denied Leach's application on November 8, 2013 and again upon reconsideration on June 6, 2014. Leach then requested a hearing before an Administrative Law Judge (ALJ). Leach and his attorney attended the hearing, which

was held on January 11, 2016. The ALJ heard testimony from Leach and Richard Fisher, a vocational expert. On April 7, 2016, the ALJ issued a finding that Leach is not disabled and is therefore ineligible for SSI.

When the Appeals Council denied Leach's request for review on March 6, 2017, the ALJ's decision became the final decision of the Commissioner of Social Security. *See Minnick v. Colvin,* 775 F.3d 929, 935 (7th Cir. 2015). Leach filed this lawsuit seeking judicial review of the Commissioner's final decision, in accordance with 42 U.S.C. § 405(g). Both Leach and the Commissioner of Social Security have moved for summary judgment.

**The ALJ's decision**

In reaching his decision, the ALJ used the standard five-step analysis set forth in the Social Security regulations to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a). At step one, the ALJ determined that Leach meets the insured status requirements of the Social Security Act. At step two, the ALJ found that Leach had not engaged in substantial gainful activity (SGA) since his alleged disability onset date.

At step three, the ALJ determined that Leach does not have an impairment or combination of impairments that meets or medically equals the severity of the one of the impairments listed in 20 CFR Part 404, Subpart B, Appendix 1. The listed impairments that the ALJ considered were major dysfunction of joints (1.02), disorders of the spine (1.04), affective disorders (12.04), and anxiety-related disorders (12.06). The ALJ also considered the unlisted condition of obesity and addressed whether an impairment in combination with obesity medically equaled a listing; he found none did.

The ALJ first evaluated whether the severity of Leach's mental impairments related to 12.04 and 12.06 satisfied the "Paragraph B" criteria. To satisfy the Paragraph B criteria, the mental impairments must result in at least two of the following: marked restriction in activities of daily living; marked difficulty in maintaining social functioning; marked difficulty in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

The ALJ found that Leach has a mild restriction in activities of daily living, noting that he does not report any difficulty in maintaining his personal hygiene and that he appeared well-groomed at his psychological and psychiatric examinations. R. 24. The ALJ also stated that although Leach struggles to perform household chores, he attributes his difficulties to physical impairments rather than mental impairments. R. 24.

The ALJ went on to find that Leach has mild difficulties in social functioning. He pointed to Leach's testimony that he spends time with others as well as mental health records that indicate he was cooperative and pleasant at examinations. R. 24.

The ALJ found that Leach has moderate difficulties in maintaining concentration, persistence, or pace given his testimony that he has no difficulty in concentrating while he plays games, including video games. R. 24. The ALJ also noted that Leach reports difficulty in remembering to take his medication and that his attention and concentration were only fair at a mental status examination in October 2014. R. 24.

The ALJ found no evidence in Leach's medical history of an extended episode of decompensation—a temporary increase in symptoms accompanied by a loss of adaptive functioning that lasts for at least two weeks.

At step four of the five-step analysis, the ALJ evaluated Leach's residual

functional capacity (RFC) to perform physical and mental work activities given his physical and mental impairments. He concluded that Leach has the physical ability to perform light work and the mental capacity to perform simple to moderately complex tasks and make simple to moderately complex work-related decisions with frequent contact with coworkers and supervisors and occasional contact with the public. R. 25. In making this determination, the ALJ took into account the opinions of Leach's treating physician, the testimony of Leach and his fiancée, and the state agency medical and psychological consultants. The ALJ did not address the opinions of Leach's mental health therapist or his examining psychiatrist.

Regarding Leach's physical RFC, the ALJ gave little weight to the opinion of Dr. Christoff, Leach's primary care physician. Dr. Christoff opined that because of Leach's lumbar disc abnormalities, he needs his cane at all times for balance and ambulation, and he can walk "maybe two blocks max." R. 384. Dr. Christoff further stated that Leach cannot lift 10 pounds, must change positions more than once every two hours due to his pain, and can only sit or stand for fifteen minutes at a time. Dr. Christoff stated that Leach "has mood issues, pain issues requiring narcotics which sedate him, and he is in constant pain which in my opinion all make him disabled at this time." R. 392. Dr. Christoff also found Leach medically unfit to drive due to severe fatigue. R. 952. The ALJ, however, found that Leach's medical records generally showed minimal abnormalities, and thus do not support the extensive limitations identified by Dr. Christoff. R. 30.

The ALJ gave some weight to the state agency medical consultants, who found that Leach is able to work at the light exertion level. R. 29. The consultants opined that

4

Leach can stand, walk, or sit for up to six hours during an eight-hour work day and can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. R. 29. The state agency consultants also found that Leach can stoop and climb ladders only occasionally. R. 29.

The ALJ gave little weight to the opinions of the State agency psychological consultants, who opined that Leach has a mild restriction on the activities of daily living; mild difficulty in maintaining social functioning; mild or less difficulty in maintaining concentration, persistence or pace; and no episodes of decompensation. R. 30. The ALJ found that the medical record shows that Leach has greater restrictions than the state consultants identified. R. 30.

The ALJ gave no weight to the opinions of Leach's mental health therapist, Terry Nolan, who stated that Leach had marked restrictions in socialization and activities of daily living. R. 30. The ALJ also gave no weight to the opinion of the examining psychiatrist, Dr. Edward Navakas, who found Leach to have marked restrictions in every category of the Paragraph B criteria. R. 30.

At the final step of the sequential evaluation process, the ALJ found that Leach is unable to perform any of his past relevant work as a demonstrator and merchandise displayer. R. 31. The ALJ concluded, however, that there are other jobs in "significant numbers in the national economy" that Leach can perform given his RFC, education, and work experience. The ALJ therefore denied Leach's application for SSI benefits. R. 32.

## Discussion

The Court will affirm the decision of the ALJ if it is supported by substantial

evidence. *Meuser v. Colvin,* 838 F.3d 905, 910 (7th Cir. 2016). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin,* 743 F.3d 1118, 1121 (7th Cir. 2014). The Court gives deference to the ALJ's decision so long as the ALJ provides "an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled." *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008).

Leach contends that the ALJ erred by 1) improperly evaluating the opinions of treating and examining health care experts; 2) negatively assessing Leach's credibility; 3) underestimating the significance of his mental impairments; and 4) failing to account for all of his physical impairments in the RFC assessment.

## 1. Opinions of medical experts

Under regulations applicable in Leach's case, a treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010). If an ALJ decides not to give the treating physician controlling weight, he "must offer good reasons for declining to do so." *Larson*, 615 F.3d at 749 (internal quotation marks omitted).

Dr. Christoff has been Leach's primary care physician for over a decade; his relationship with Leach is long-standing, and his treatment notes are extensive. The ALJ recognized Dr. Christoff as Leach's treating physician, and both parties agree with this determination. R. 30. The ALJ found, however, that Dr. Christoff's opinion was inconsistent with medical records and therefore did not deserve controlling weight. R.

6

30. More specifically, the ALJ determined that "minimal abnormalities" in Leach's spinal x-rays and "numerous findings of normal gait" contradicted Dr. Christof's reference to extensive physical limitations. R. 30.

Leach contests these findings and contends that the ALJ engaged in "cherry-picking" of evidence by discounting or ignoring evidence that supported Christoff's opinion. The Court agrees. Although the record indeed included "numerous findings of normal gait," *see* R. 322, 334, 338, the ALJ did not address equally numerous findings by several different medical providers that Leach had abnormal, slow, guarded, antalgic, or wide-based gait. See R. 549, 586, 612, 743, 745, 749, 988. These abnormal findings of gait are noted in the ALJ's summary of Leach's medical history, but the ALJ did not explain if or how he considered them before withholding controlling weight from Dr. Christoff's opinion. The Seventh Circuit has also noted that normal gait alone does not necessarily correlate with the ability to sit or stand for six hours a day. *See Murphy v. Colvin,* 759 F.3d 811, 819 (7th Cir. 2014). It is therefore unclear, and the ALJ did not explain, why findings of normal gait in some of Leach's examinations provide an appropriate basis to diminish the weight given to Dr. Christoff's opinion.

The ALJ also characterized scans (x-rays and MRIs) of Leach's back as showing only "minimal abnormalities," R.26, but a closer review indicates otherwise. In 2009, Leach's spinal scans showed moderate to severe spinal stenosis at L3-4, with improved to moderate stenosis in 2011. R. 292. The scans showed multilevel degenerative changes between 2009 and 2011. R. 292. Scans taken in 2013 again showed multilevel degenerative changes at L2-3, L3-4, and L5-S1. R. 294-95. By 2015, Leach's abnormalities had increased, with to further degeneration at L1-2 and L5-S1,

7

disc bulging at multiple levels, and foraminal stenosis at L4-5 and L5-S1. R. 389. It would be difficult to characterize this evidence as showing only "minimal abnormalities," as the ALJ stated.

Further evidence of the impact of Leach's back condition on his physical abilities lies in that fact that, over the years, Dr. Christoff prescribed Leach various pain medications and referred him to physical therapists, neurologists, and orthopedic surgeons for further treatment. Dr. Christoff's opinion also aligns with the testimony of Leach and his partner, Beth Downs, who stated that Leach is in too much pain to do much other than lie in his recliner for most of the day. The ALJ did not explain if or whether he considered any of this corroborating evidence before withholding controlling weight from Dr. Christoff's opinion. This issue alone requires remand.

Once an ALJ finds that a treating physician's opinion does not deserve controlling weight, he must decide what specific weight to give the opinion. *Brown v. Colvin,* 845 F.3d 247, 252 (7th Cir. 2016). In so doing, the ALJ should consider length and nature of the treatment, the frequency of examination, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole. *Scrogham v. Colvin,* 765 F.3d 685, 697 (7th Cir. 2014).

The ALJ assigned little weight to Dr. Christoff's opinion regarding Leach's limitations for sitting, standing, walking, and driving. The ALJ reasoned that determinations regarding Leach's dizzy spells and problems with ambulation are outside of Dr. Christoff's area of expertise, given that he practices internal medicine and Leach's impairments are neurological and orthopedic in nature. That is, at best, a highly suspect basis for devaluing Dr. Christoff's opinion. Though the opinion of a specialist is

appropriately afforded greater weight in an area relevant to his or her expertise, no neurologist or orthopedic specialist has evaluated Leach's ability to perform work-related tasks. Thus there is no specialist on record contradicting Dr. Christoff's opinion. Furthermore, though an orthopedic specialist is likely in the best position to determine and administer treatment for musculoskeletal issues, a primary care physician like Dr. Christoff is fully capable of evaluating whether a patient can walk, sit, push, pull, or perform other everyday movements. It likewise does not take a neurologist to determine that a patient who has hand tremors, dizzy spells, and major sleep abnormalities should not be driving.

The Court also finds dubious the ALJ's statement that Dr. Christoff's opinion about Leach's limitations deserves less weight because he is unfamiliar with the evidentiary requirements for determining disability under the SSA. There is no requirement that a physician be familiar with Social Security regulations; if there were, one would be hard pressed to find any reliable medical expert testimony at all.

Although the errors cited above are sufficient to require remand, the Court will address the remaining issues discussed by the parties to facilitate further review.

Leach next contests the ALJ's rejection of the opinion of Terry Nolan, a mental health therapist, and Dr. Navakas, an examining psychiatrist. Nolan opined that Leach has marked restrictions to his daily activities and socialization. Nolan's records, however, provided few details regarding his sessions with Leach; he generally noted that medication was effective, Leach reported no suicidal ideation and did not display signs of debilitating emotional distress, he displayed a "new, hopeful attitude," and his physical health was a major factor in his emotional health. R. 949-51. In his report to

the SSA, Nolan attributed Leach's limitations in daily activity to his physical impairments rather than his mental impairments. R. 930. Based on these facts, the ALJ reasonably found that Nolan's opinion lacked supporting medical evidence.

As for the opinion of psychiatrist Dr. Navakas, the ALJ was not required to assign any particular weight to the opinion of a non-treating physician. *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012). The ALJ reasonably declined to give any weight to Dr. Navakas' opinion that Leach has marked impairments in all Paragraph B criteria. The ALJ satisfied the requirement to "minimally articulate" his reasoning, *id.* at 869: he stated that Navakas examined Leach only once and that Leach's mental health treatment generally show minimal abnormalities at examinations. R. 30. Though this explanation was on the cursory side, it meets the minimal standard.

**2.    Assessment of Leach's credibility**

Typically, an ALJ's credibility assessments are afforded special deference "because [he] is in the best position to determine a witness's truthfulness and forthrightness." *Stepp v. Colvin,* 795 F.3d 711, 720 (7th Cir. 2015) (citing *Shideler v. Astrue,* 688 F.3d 306, 310-11 (7th Cir. 2012)). Thus an ALJ's credibility assessment will be overturned only if it is "patently wrong." *Id.* A credibility assessment may be patently wrong, however, if the ALJ does not explain his decision sufficiently for the Court to determine whether he "reached [his] decision in a rational manner, logically based on [his] specific findings and evidence in the record." *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014).

Here, the ALJ used boilerplate language to state that Leach's statements regarding his symptoms were not fully supported by medical evidence. The ALJ based

this determination on the supposedly minimal clinical abnormalities identified during examinations and the purported improvement of Leach's symptoms with treatment.

The ALJ's credibility determination was not properly supported. The key problem is that the determination was based on "improvements" that are not supported by the medical record. Rather, the record shows an increase in Leach's pain symptoms over time, an accompanying increase in the level of treatment, and mixed overall success of this treatment. For example, Leach continued to experience pain even after receiving several rounds of radio frequency ablations, and he was referred to physical therapy in November 2015. R. 821, 1001. At the outset of his physical therapy sessions, he was taking narcotic pain medications every day to attempt to control his pain. R. 1001. On his fifteenth and final physical therapy session, Leach could not complete his exercises because he had spent an hour standing the day before and was still recovering from the exertion. R. 1048. Leach and his physical therapist decided to discontinue their sessions because Leach had hit a functional plateau. R. 1050. Surely such results cannot reasonably be characterized as "improvements." And even if they could, the question is not whether Leach improved, but "whether [he] improved enough to meet the legal criteria of not being classified as disabled." *Murphy,* 759 F.3d at 819. This requirement was not addressed by the ALJ.

Leach also contends that the ALJ also improperly evaluated the credibility of his statements regarding his mental health. The Court addresses this point in the following subsection, together with the ALJ's overall assessment of Leach's mental limitations.

3. **Evaluation of Leach's mental impairments**

The ALJ evaluated the severity of Leach's mental health impairments under the

Paragraph B criteria and found that Leach's symptoms did not meet the severity of listings in 12.04 or 12.06.  The ALJ then analyzed Leach's mental RFC and found that his impairments limit him to simple to moderately complex tasks and decision making, with frequent contact with coworkers and supervisors, and occasional contact with the public.  R. 25.  In reaching this conclusion, the ALJ gave no weight to the opinions of Leach's mental health therapist, Terry Nolan; no weight to the examining psychiatrist, Dr. Navakas; and little weight to the opinions of the State agency psychological consultants.

Leach argues that the ALJ failed to properly account for the true extent of his mental deficits in making the RFC assessment.  More specifically, Leach contends that the ALJ improperly focused on Leach's ability to play video games and on his well-groomed appearance and cooperative demeanor at mental examinations.

The Court disagrees.  It likely would have been problematic if the ALJ had supported his conclusion *only* with evidence of a well-groomed appearance and ability to concentrate on video games, but that is not what happened.  The ALJ considered Leach's mental health records as a whole, including evidence that he maintained concentration and attention throughout his evaluations, *see* R. 28, and he considered Leach's own statements that his depression and anxiety improved with medication and therapy.  R. 633, 639, 930.  The record also reflects that Leach's judgment tended to be "fair" or "poor" only when his medication needed to be adjusted or when he stopped taking medication altogether.  R. 645, 626, 752, 407.

In written statements, Leach said that he can follow written instructions "very well" and spoken instructions "pretty well."  R. 213, 238.  At the hearing, Leach testified

that he can follow clear and concise instructions and that he is "okay" with simple directions. R. 60-61. He further stated that he struggles to function in noisy, crowded environments. Taken together, these facts permitted a reasonable conclusion that Leach is able to perform simple to moderately complex tasks, with frequent contact with coworkers and supervisors but limited contact with the public.

**4.     Evaluation of other physical impairments**

Leach contends that the ALJ did not adequately account for his sleep apnea, patellofemoral syndrome, and hypothyroidism, all of which are non-severe impairments; or for his obesity, a severe impairment. The ALJ pointed to specific evidence in the record to support the conclusion that none of these conditions imposed more than minimal limitations on Leach's ability to perform basic work activities. R. 23. The ALJ later provided a more cursory statement that he considered the impairments in determining Leach's RFC but found that they do not impose any further limitations. Taken together, this was a sufficient explanation.

Notably absent from the ALJ's opinion, however, was any discussion of Leach's hand tremors. Leach testified that he has difficulty handling silverware, typing, and using his game controllers because of his hand tremors. R. 61-62. There is ample evidence in the medical record to support his testimony, including an appointment with a neurologist specifically to address the tremors. R. 676, 626, 682, 991. The Commissioner argues that Leach's tremors are not severe because the medical record does not show that they stem from an underlying anatomical impairment, as required under 20 C.F.R. § 404.1521 to establish a "medically determinable impairment." The cause of Leach's tremors is unclear; they may be a side effect of medication or a

13

symptom of some other impairment. But whatever the cause, Leach does not need to show that the tremors are a severe impairment in and of themselves. Even if the hand tremors may not have been disabling standing alone, their effect in combination with Leach's other impairments may have a critical impact on whether he can work, a point not addressed by the ALJ. *See Yurt v. Colvin,* 758 F.3d 850, 860 (7th Cir. 2014). On remand, the SSA should examine carefully the effect of Leach's hand tremors on his ability to work.

## Conclusion

For the reasons stated above, the Court grants plaintiff's motion for summary judgment [dkt. no. 12] and denies defendant's motion for summary judgment. The Court directs the Clerk to enter judgment vacating the denial of SSI benefits and remanding the case to the Social Security Administration for further proceedings consistent with this decision.

Date: May 25, 2018

_____
MATTHEW F. KENNELLY
United States District Judge